**PAPYRUS TECHNOLOGY CORP.,**
**Plaintiff and Counterclaim–**
**Defendant,**

v.

**NEW YORK STOCK EXCHANGE,**
**INC., Defendant and Counter-**
**claim–Plaintiff.**

No. 04 Civ. 00625(RCC).

United States District Court,
S.D. New York.

June 29, 2004.

Edgar H. Haug, Steven M. Amundson, Frommer Lawrence & Haug, LLP, New York City, for plaintiff.

Christopher E. Chalsen, Stephen J. Blauner, Michael M. Murray, Milbank, Tweed, Hadley & McCloy, LLP, New York City, James J. Shalek, Proskauer Rose, LLP, New York City, for defendant.

## OPINION & ORDER

CASEY, District Judge.

This case arises from the allegations of Papyrus Technology Corp. ("Papyrus")[1] that the New York Stock Exchange, Inc. ("NYSE") committed patent infringement and breach of contract.[2] Specifically, Pa-

---

1. Papyrus, founded in 1992 by L. Thomas Patterson, Jr., provides wireless handheld devices to stock brokers on the trading floor of securities exchanges. (Declaration of L. Thomas Patterson, Jr. [Patterson Decl.] ¶ 2.) It claims to own four patents for a wireless handheld device which it supplied to the New York Stock Exchange until 1995, when Papyrus's continued operations on the floor of the exchange became economically impracticable. (Complaint [Compl.] ¶¶ 5–8; Patterson Decl. ¶ 2.) Since 1995, Papyrus has functioned merely as a patent holding company. (Id. ¶ 5.)

2. The NYSE, located at 11 Wall Street, New York, New York, is a not-for-profit corporation registered with the Securities and Exchange Commission as a national securities exchange. (Compl. ¶ 4; Corrected Answer ¶ 4; Corrected Counterclaim ¶ 1.)

pyrus alleges that the NYSE violated its four patents for a wireless device that enables brokers to make and receive inquiries, receive and execute orders, and provide instructions for orders. Papyrus further alleges that the NYSE breached its contractual obligations by not paying to use the proprietary technology. The NYSE counterclaims for a declaratory judgment that the NYSE has not violated the four patents.

The issues presently before the Court, however, have little to do with patent infringement and the work of the stock exchange. Instead, the present dispute implicates the work of attorneys, the ethics of the profession, and a litigant's right to choose its counsel. The NYSE moves to disqualify Mr. Tedd Van Buskirk and the law firm of Frommer Lawrence & Haug ("Frommer") from serving as Papyrus's counsel. The NYSE claims that while an associate at Milbank, Tweed, Hadley & McCloy ("Milbank"), which represents NYSE, Van Buskirk had access to and received NYSE confidences or secrets material to this case.[3] As a result, the NYSE argues that Van Buskirk and Frommer may not represent Papyrus. For the reasons set forth below, NYSE's motion is **GRANTED IN PART AND DENIED IN PART.**

## BACKGROUND

From May 1988 through June 2001, Van Buskirk was an associate in Milbank's twelve-member intellectual property group. (Declaration of Tedd W. Van Buskirk, dated March 9, 2004 [3/9/04 Van Buskirk Decl.] ¶ 2; Declaration of Christopher E. Chalsen [Chalsen Decl.] ¶¶ 5–6.) While he worked for Milbank, the NYSE retained the firm to provide advice on the Papyrus patents, which are the subject of this dispute. (*Id.* ¶ 9.) It is undisputed that Van Buskirk never worked on the NYSE–Papyrus matter while at Milbank. (*Id.;* 3/9/04 Van Buskirk Decl. ¶¶ 3, 7; Declaration of Tedd W. Van Buskirk, dated April 8, 2003[sic] [4/8/04 Van Buskirk Decl.] ¶ 11.)

Nonetheless, the NYSE contends that Van Buskirk received NYSE confidences or secrets related to the patents on several instances. First, the NYSE avers that Van Buskirk attended weekly meetings of the intellectual property group, at which confidential client matters were discussed. (Chalsen Decl. ¶¶ 8, 11.) Papyrus responds that the discussions at these meetings concerned developments in intellectual property law, for which Van Buskirk received continuing legal education credit.[4] (4/8/04 Van Buskirk Decl. ¶¶ 17–

**3.** A confidence is defined by the New York State Bar Association's Disciplinary Rules ("D.R.") as "information protected by the attorney-client privilege under applicable law," and a secret is any "other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would likely be detrimental to the client." D.R. 4–101(A); *see also UCAR Int'l, Inc. v. Union Carbide Corp.,* No. 00 Civ. 1338, 2002 WL 31519616, at *2 (S.D.N.Y. Nov.8, 2002).

**4.** The fact that attendees of the weekly meetings received continuing legal education credit is significant because New York's Mandatory Continuing Legal Education (MCLE) regulations provide that, "[n]o CLE credit

may be earned for activity in connection with a pending case." (MCLE Regulations § 3(D)(4), Ex. A to Declaration of Steven M. Amundson [Amundson Decl.].) This fact belies NYSE's claim that attendees discussed strategy or tactics of on-going litigation. In addition, the NYSE fails to provide dates and times of the meetings or the names of those in attendance. In light of NYSE's high burden of proof, *see Evans v. Artek Sys. Corp.,* 715 F.2d 788, 791 (2d Cir.1983); *Gov't of India v. Cook Indus., Inc.,* 569 F.2d 737, 739 (2d Cir.1978); *UCAR,* 2002 WL 31519616, at *2; *Fields–D'Arpino v. Rest. Assocs., Inc.,* 39 F.Supp.2d 412, 415 (S.D.N.Y.1999), its bald, conclusory allegation that Van Buskirk received confidences or secrets during these

18.) Second, the NYSE proffers that Van Buskirk actually received NYSE confidences or secrets when he received three emails concerning the NYSE–Papyrus matter. (Email, Ex. A to Chalsen Decl.; Emails, Ex. A to Declaration of Chris L. Holm [Holm Decl.].) Each was sent on August 24, 2000, by Milbank partners; two were addressed to the entire Milbank intellectual practice group while the third was sent solely between Milbank partners (therefore, it appears that Van Buskirk never received the third email). (Email, Ex. A to Chalsen Decl.; Emails, Ex. A to Holm Decl.; 4/8/04 Van Buskirk Decl. ¶¶ 4–9.)[5] To the extent that he did receive confidential information on the NYSE–Papyrus matter, Van Buskirk no longer recalls its substance. (3/9/04 Van Buskirk Decl. ¶ 3; 4/8/04 Van Buskirk Decl. ¶¶ 4, 6, 10, 12, 18.)

In addition to alleging that Van Buskirk actually received NYSE confidences or secrets, the NYSE contends that he had access to such information. For example, the NYSE points to the fact that Milbank's files relating to the NYSE–Papyrus matter were stored near Van Buskirk's office. (Chalsen Decl. ¶¶ 12–13.) The NYSE further posits that Van Buskirk (like all Milbank intellectual property attorneys) had access to a centralized electronic document management system and that he could have accessed electronic versions of documents. (*Id.* ¶ 14.) Papyrus counters that Van Buskirk never had reason to review either the paper or electronic documents and never did so. (4/8/04 Van Buskirk Decl. ¶¶ 13–15.) Moreover, Papyrus argues that Milbank's electronic document management system tracks when a person has accessed an electronic document and records the person's name and time of access, but that the NYSE has not furnished evidence to demonstrate Van Buskirk reviewed these files. (*Id.* ¶ 16.)

Van Buskirk transferred from Milbank to Frommer in June 2001. (Chalsen Decl. ¶ 5; 3/9/04 Van Buskirk Decl. ¶ 2.) Since then, Papyrus approached Frommer about suing the NYSE for patent infringement after its long-time attorneys at Darby & Darby withdrew on conflict grounds. (Declaration of Edgar H. Haug [Haug Decl.] ¶ 2; Patterson Decl. ¶¶ 3, 10–13; Chalsen Decl. ¶ 18.) Around November 2003, Papyrus retained the fifty-member

---

meetings is insufficient to warrant Van Buskirk's and/or Frommer's disqualification.

5. The NYSE has provided the emails to the Court in a completely redacted form such that only the sender and recipients are identifiable. Providing redacted evidence in a disqualification motion is appropriate. *See, e.g., Cheng v. GAF Corp.,* 631 F.2d 1052, 1056 (2d Cir.1980), *vacated on other grounds,* 450 U.S. 903, 101 S.Ct. 1338, 67 L.Ed.2d 327 (1981) ("It is well established that a court may not inquire into the nature of the confidences alleged to have been revealed to the tainted attorney. To require proof of access to privileged information would 'put the former client to the Hobson's choice of either having to disclose his privileged information in order to disqualify his former attorney or having to refrain from the disqualification motion altogether.' ") (quoting *Gov't of India,* 569 F.2d at 740); *United States Football League v. Nat'l Football League,* 605 F.Supp. 1448, 1461 (S.D.N.Y.1985) (holding that inquiry into whether confidential information was transmitted between attorney and client is improper because "it would put the movant to the choice of either revealing its confidences in order to prevail on the motion or else moving to disqualify, thereby running the risk that its adversary will use its confidences against it in the litigation."). Although the NYSE has offered to make these emails available for in camera review, whether to accept that invitation is a decision that lies within the discretion of the Court. *See Decora Inc. v. DW Wallcovering, Inc.,* 899 F.Supp. 132, 135–36 (S.D.N.Y.1995); *see also Gov't of India,* 569 F.2d at 741 (Mansfield, J., concurring). The Court has determined that it would be imprudent and unnecessary to review the substance of the emails in order to resolve this motion.

Frommer law firm to represent it in this action. (Haug Decl. ¶¶ 2, 16.)

Immediately after Papyrus approached Frommer, it conducted a conflict check by, among other things, circulating a memo to all attorneys. (*Id.* ¶ 2.) In response to the memo, Van Buskirk informed a Frommer partner that he previously worked at Milbank where he had been aware of a dispute between Papyrus and the NYSE. (3/9/04 Van Buskirk Decl. ¶ 6; Haug Decl. ¶ 3.) However, Van Buskirk stated that he had neither worked on the NYSE–Papyrus matter nor on any other NYSE matter. (3/9/04 Van Buskirk Decl. ¶ 6; Haug Decl. ¶ 3.) Van Buskirk further advised the partner that he did not recall learning any privileged or confidential NYSE information while at Milbank. (3/9/04 Van Buskirk Decl. ¶ 6; Haug Decl. ¶ 3.) Because Van Buskirk had previously worked at Milbank and had a general knowledge of the NYSE–Papyrus matter, he was not assigned to work on the case. (3/9/04 Van Buskirk Decl. ¶ 6; Haug Decl. ¶ 4.)

On March 1, 2004, for the first time, NYSE's counsel raised Van Buskirk's previous employment as a reason for disqualification of both Van Buskirk and Frommer. (*Id.* ¶ 9; Amundson Decl. ¶ 2.) On March 5, 2004, when Milbank provided Frommer a redacted copy of an email message that listed Van Buskirk as an addressee, Frommer immediately implemented a formal screen to ensure that Van Buskirk was not involved with or had access to information regarding the NYSE–Papyrus matter.[6] (Haug Decl. ¶ 10; Amundson Decl. ¶ 4.) Frommer instituted the following screening mechanisms: (1) all Frommer employees were directed to refrain from discussing the Papyrus litigation with Van Buskirk; (2) all Frommer employees were instructed that Van Bus-

kirk should not see any written materials related to the NYSE–Papyrus matter; and (3) Van Buskirk was ordered to refrain from communicating with anyone about or reviewing any written materials related to the NYSE–Papyrus matter. (Haug Decl. ¶ 11.) All Frommer employees have agreed in writing to abide by these restrictions. (*Id.* ¶ 12.) Finally, Frommer has sealed the firm's document management system (typically accessible by any firm employee) so that only the team working on the case may access electronic documents. (*Id.* ¶ 13.) While at Frommer, Van Buskirk has performed no work on the NYSE–Papyrus matter. (3/9/04 Van Buskirk Decl. ¶ 5; 4/8/04 Van Buskirk Decl. ¶ 19.)

## DISCUSSION

■ There are two instances when an attorney may be subject to possible disqualification: (1) when the challenged attorney is concurrently representing adverse interests so that the attorney's vigor in pursuing one of them may be questioned; and (2) when the attorney has successively represented adverse interests, raising the possibility that confidences or secrets derived from the former representation may be used in the current representation to the former client's detriment. *See United States Football League,* 605 F.Supp. at 1452. This motion implicates the latter.

■ Disqualification motions premised on an attorney's prior representation of a now adverse client are committed to the discretion of the district court. *See Cheng,* 631 F.2d at 1055. In addition, such motions are generally viewed with disfavor in this Circuit. *See Evans,* at 791–92; *Song v. Dreamtouch, Inc.,* No. 01 Civ.

---

**6.** Before instituting a formal screening procedure, only three Frommer attorneys worked on the NYSE–Papyrus matter and none dis-

cussed the case with Van Buskirk. (Declaration of Ali Samadi ¶¶ 3, 5; Haug Decl. ¶¶ 3–5; Amundson Decl. ¶ 5.)

0386, 2001 WL 487413, at *4 (S.D.N.Y. May 8, 2001); *Interpetrol Bermuda, Ltd. v. Rosenwasser,* No. 86 Civ. 5631, 1988 WL 140801, at *1 (S.D.N.Y. Dec.20, 1988). For this reason, the Second Circuit has directed that courts faced with disqualification motions take a "restrained approach that focuses primarily on preserving the integrity of the trial process." *Armstrong v. McAlpin,* 625 F.2d 433, 444 (2d Cir.1980), *vacated on other grounds and remanded,* 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981); *see also United States Football League,* 605 F.Supp. at 1463 n. 31 ("Courts are not policemen of the legal profession; that is a matter for the disciplinary arm of the bar. Disqualification is granted to protect the integrity of the proceedings, not to monitor the ethics of attorneys' conduct."); *cf. Wheat v. United States,* 486 U.S. 153, 160, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988) (stating that in criminal trials "federal courts have an independent interest in ensuring [trials] are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them."). Moreover, a district court must consider the factual record underlying such a motion in detail to determine whether the party seeking disqualification has sustained the high standard of proof necessary to disqualify opposing counsel. *See Evans,* 715 F.2d at 791; *Gov't of India,* 569 F.2d at 739; *UCAR,* 2002 WL 31519616, at *2; *Fields–D'Arpino,* 39 F.Supp.2d at 415.

█ The NYSE contends that under the New York State Bar Association's Disciplinary Rules Van Buskirk must be dis-

qualified from representing Papyrus and that his disqualification ought to be imputed to the entire Frommer firm. Although New York's Disciplinary Rules are not binding on federal courts—as they were intended for use in disciplinary proceedings rather than in attorney disqualification motions—the Court refers to these rules, and to the Committee on Professional Ethics's opinions interpreting them, for guidance.[7] *See, e.g., Cheng,* 631 F.2d at 1055–56; *Stratavest,* 903 F.Supp. at 666; *United States Football League,* 605 F.Supp. at 1463 n. 31. Moreover, this Court requires that attorneys adhere to New York's Disciplinary Rules. *See* S.D.N.Y. Local Civil R. 1.3, 1.5.

## I. Van Buskirk's Disqualification under Disciplinary Rule 5–108

Disciplinary Rule 5–108(A) warns that:

[A] lawyer who has represented a client in a matter shall not, without the consent of the former client after full disclosure:

1. Thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client.

2. Use any confidences or secrets of the former client except as permitted by DR 4–101 . . . .

█ New York courts have explained that a disqualifying conflict exists on the basis of a former representation when: (1) an attorney-client relationship previously existed between the moving party and the

7. Courts generally look to the American Bar Association's Code of Professional Responsibility for guidance to evaluate an attorney disqualification motion. *See, e.g., Evans,* 715 F.2d at 791; *Cheng,* 631 F.2d at 1055–56; *Crudele v. New York City Police Dep't,* Nos. 97 Civ. 6687, 7366, 9515, 9516, 2001 WL 1033539, at *3 (S.D.N.Y. Sept.7, 2001); *Fields–D'Arpino,* 39 F.Supp.2d at 414 n. 2.

The ABA Code provisions on the representation of successive clients with adverse interests has been adopted by the New York State Bar Association in its disciplinary rules. *See Stratavest Ltd. v. Rogers,* 903 F.Supp. 663, 666 (S.D.N.Y.1995). Because no dispute exists between the two, the Court will refer to the New York Disciplinary Rules.

opposing counsel; (2) the matters involved in the current and former representations are the same or substantially related; and (3) the interests of the present client and the former client are materially adverse. *See Tekni–Plex, Inc. v. Meyner & Landis,* 89 N.Y.2d 123, 651 N.Y.S.2d 954, 674 N.E.2d 663, 667 (1996). There is no material dispute that Milbank represented the NYSE during Van Buskirk's tenure as an associate, that Frommer represents Papyrus on essentially the same matter, or that the NYSE and Papyrus hold adverse interests. The disputed issue is whether an attorney-client relationship existed between the NYSE and Van Buskirk.

▆▆▆ Papyrus argues that disqualification is unnecessary because there existed no attorney-client relationship between the NYSE and Van Buskirk. For purposes of D.R. 5–108(A), a lawyer need not have an express attorney-client relationship with the former client. *See Glueck v. Jonathan Logan, Inc.,* 653 F.2d 746, 748–49 (2d Cir. 1981) (stating that "the issue is not whether [the attorney's] relationship to [the former client] is in all respects that of attorney and client, but whether there exists sufficient aspects of an attorney-client relationship for purposes of triggering inquiry into the potential conflict involved"); *Marshall v. State of New York Div. of State Police,* 952 F.Supp. 103, 108 (N.D.N.Y.1997) (concluding that in attorney disqualification motions whether the attorney's "relationship with the [former client] rose to the level of 'attorney-client' is not the ultimate issue."). Rather, a lawyer has "represented a client" if the lawyer has obtained or had access to confidences or secrets of the former client. *See*

N.Y. State Bar Ass'n Comm. on Prof'l Ethics, Op. 723 (1999) [Ethics Op. 723]. While at Milbank, Van Buskirk received emails and had access to files regarding the NYSE–Papyrus matter. Therefore, under D.R. 5–108(A), he represented the NYSE.

Disciplinary Rule 5–108(A) is "premised on the irrebuttable presumption that a lawyer who formerly represented a client will have obtained secrets and confidences of the client." *Id.* Moreover, there exists a presumption that Van Buskirk had access to NYSE confidences or secrets relevant to this case because Milbank represented the NYSE while Van Buskirk worked there. *See Decora,* 899 F.Supp. at 135–36; *United States Football League,* 605 F.Supp. at 1461. The Court is therefore not required to inquire whether confidential information was in fact transmitted to Van Buskirk. "Such an inquiry would be improper; it would put the movant to the choice of either revealing its confidences in order to prevail on the motion or else refraining from moving to disqualify." *Id.* The redacted email correspondence adequately demonstrates that Van Buskirk was actually exposed to NYSE confidences or secrets. Therefore, Van Buskirk represented the NYSE under D.R. 5–108(A) and must be disqualified from representing Papyrus.

## II. Frommer's Disqualification under Disciplinary Rule 5–105(D)

▆▆▆ The Court next turns to the remaining and presumably essential issue of the case: whether Frommer must be disqualified due to Van Buskirk's association with it. Under D.R. 5–105(D),[8] the taint of

---

8. Disciplinary Rule 5–105(D) provides that, "While lawyers are associated in a law firm, none of them shall knowingly accept or continue employment when any one of them practicing alone would be prohibited from doing so under ... DR 5–108...." Under

D.R. 5–108, Frommer (and/or Van Buskirk) would be able to represent Papyrus if, after full disclosure, the NYSE consented. *See* D.R. 5–108. By bringing this motion, the NYSE has withheld its consent.

a disqualified attorney may be imputed to the attorney's entire firm. The imputation rule is premised on the presumption that if confidences or secrets were disclosed to one member of a firm, each individual attorney in the firm has or may (intentionally or inadvertently) become privy to those confidences. Unlike the inquiry under D.R. 5–108(A), this presumption may be rebutted. *See United States Football League*, 605 F.Supp. at 1461 n. 28; *Kassis v. Teacher's Ins. & Annuity Ass'n*, 93 N.Y.2d 611, 695 N.Y.S.2d 515, 717 N.E.2d 674, 677 (N.Y.1999). In order to rebut this presumption, Frommer has manufactured a screen to fence Van Buskirk from the case. The NYSE contends that the screen was belatedly constructed and that as erected it fails to adequately enclose Van Buskirk.

Neither the New York Code of Professional Responsibility nor the American Bar Association's Code of Professional Responsibility recognize the use of screening devices except in cases involving former government lawyers or judges. *See Mitchell v. Metro. Life Ins. Co.*, No. 01 Civ. 2112, 2002 WL 441194, at *9 (S.D.N.Y. Mar.21, 2002).[9] However, courts have recognized that under appropriate circumstances a screen may rebut the presumption of shared confidences. *See, e.g., Lambert v. Chase Manhattan Bank, N.A.*, Nos. 93 Civ. 1317, 5298, 6876, 8270, 1996 WL 66130 (S.D.N.Y. Feb.15, 1996); *In re Del–Val Fin. Corp. Sec. Litig.*, 158 F.R.D. 270 (S.D.N.Y.1994); *Cummin v. Cummin*, 264 A.D.2d 637, 695 N.Y.S.2d 346, 347 (App.Div.1999). A per se rule of disqualification based on imputed confidences would be, as the New York State Court of Appeals has remarked, "unnecessarily preclusive because it disqualifies all members of a law firm indiscriminately, whether or not they share knowledge of a former client's confidences and secrets." *Solow v. W.R. Grace & Co.*, 83 N.Y.2d 303, 610 N.Y.S.2d 128, 632 N.E.2d 437, 440 (1994); *see also Kassis*, 695 N.Y.S.2d 515, 717 N.E.2d at 677 (holding that the disciplinary rule of imputation does not establish mandatory disqualification and stating that "because disqualification of a law firm may have significant adverse consequences to the client and others, 'it is particularly important that the Code of Professional Responsibility not be mechanically applied when disqualification is raised in litigation.'") (quoting *S & S Hotel Ventures v. 777 S.H. Corp.*, 69 N.Y.2d 437, 515 N.Y.S.2d 735, 508 N.E.2d 647, 651 (1987)).

The touchstones of the imputation inquiry are the significance of the prohibited lawyer's involvement in and knowledge of the former client's confidences or secrets. *See, e.g., Cheng*, 631 F.2d at 1054, 1057–58; *Crudele*, 2001 WL 1033539, at *3–6; *United States Football League*, 605 F.Supp. at 1451–52. Several factors may guide a court in undertaking this inquiry.

**9.** On the other hand, the American Law Institute's Restatement (Third) of the Law Governing Lawyers has recently recognized the use of screens to remove the imputation of shared confidences or secrets. Section 124 of the Restatement provides that a former client conflict will not be imputed to affiliated lawyers when:

[T]here is no substantial risk that confidential information of the former client will be used with material adverse effect on the former client because:

(a) any confidential client information communicated to the personally prohibited lawyer is unlikely to be significant in the subsequent matter;
(b) the personally prohibited lawyer is subject to screening measures adequate to eliminate participation by that lawyer in the representation; and
(c) timely and adequate notice of the screening has been provided to all affected clients.

Restatement (Third) of the Law Governing Lawyers § 124 (2000).

As a threshold matter, a court must examine the degree to which the tainted attorney represented the former client. For example, when an associate has played an "appreciable role" in representing an adversary in the same matter, a screen will, as a matter of law, fail to rebut the presumption of shared confidences or secrets. *See Kassis,* 695 N.Y.S.2d 515, 717 N.E.2d at 678. In *Kassis,* the court held that because a tainted attorney "appeared as sole counsel" for the adversary and was "sufficiently knowledgeable and steeped in the files of [the] case," the existence of a screen was inconsequential. *Id.* This is not the case when a tainted attorney performs only minimal work for an adversary. In *Del–Val,* for instance, the law firm Proskauer Rose Goetz & Mendelson ("Proskauer") was the subject of a disqualification motion. The court disqualified a Proskauer partner based on his previous representation, but declined to disqualify the entire firm. *See Del–Val,* 158 F.R.D. at 274–75. The court determined that the presumption of shared confidences was rebuttable in part because the tainted attorney's involvement in the representation had been peripheral. *Id.* at 274. Likewise, in *Lambert,* the court determined that the Milbank firm could rebut the presumption of shared confidences. The court premised its conclusion on the fact that, although a Milbank associate had performed eight-hundred hours of work for an adverse client while at another firm, the work consisted largely of document review and participation in depositions. *Id.* at *1. Given the nature of this work, the court concluded that "[w]hile [it] understands that [the associate] will have been privy to relevant confidences, including some strategy considerations, he was, plainly, not a strategy-maker." *Id.* Here, it is undisputed that Van Buskirk was not a strategy-maker; in fact, he performed no work on the NYSE–Papyrus matter while at Milbank. Given that Van Buskirk's previous involvement in the case was minuscule, Frommer may rebut the presumption of shared confidences or secrets.

Although no bright line rule exists, another pertinent consideration as to whether the presumption has been rebutted is the relative recency of Van Buskirk's employment with Milbank. For example, in *Lambert,* the court noted that the associate had been separated from his prior firm for more than a year. *Id.; see also Wieme v. Eastman Kodak Co.,* Nos. 02 Civ. 6021L, 6212, 2003 WL 23163157, at *5 (W.D.N.Y. Sept. 22, 2003) (noting that, although not dispositive, the passage of time is a relevant factor in a disqualification inquiry). Here, almost thirty months had passed between the time Van Buskirk worked at Milbank and when Papyrus retained Frommer. Such a gap in time weighs in Papyrus's favor.

Moreover, a party may attempt to rebut the presumption of shared knowledge through affidavits setting-forth the tainted attorney's recollection of any confidential information and whether the attorney shared such information with co-workers. *See Del–Val,* 158 F.R.D. at 274 (weighing disqualified attorney's affidavit stating that he did not speak to anyone at firm regarding previous representation of former client and that he no longer recalled the confidential information he received). Papyrus has submitted affidavits by Van Buskirk to rebut the presumption of shared knowledge. In these affidavits, Van Buskirk states that he does not recall any confidential information gleaned from his time at Milbank. Moreover, he states that he did not speak to anyone at Frommer regarding the substance of the case. Each of the Frommer attorneys who worked on the NYSE–Papyrus matter before a formal screen was instituted likewise affirm. These affidavits also weigh against imputing Van Buskirk's disqualification to Frommer.

Another reason why Van Buskirk's conflict should not be imputed to Frommer is that Van Buskirk's actual receipt of NYSE confidences or secrets was limited. The record chiefly consists of two emails Van Buskirk received some four years ago. The emails were correspondence between Milbank partners and were merely copied to the entire Milbank intellectual property group. Thus, Van Buskirk received the emails even though he was not working on the case. The passage of time since Van Buskirk received these emails and their wide distribution suggest that their contents (even if Van Buskirk recalled them) are unlikely to be highly significant to the current issues in this case. *See* Restatement (Third) of the Law Governing Lawyers § 124(2)(a) (establishing as a factor for not imputing a former client conflict to affiliated lawyers the situation when "confidential client information communicated to the personally prohibited lawyer is unlikely to be significant in the subsequent matter"). The limited record establishing Van Buskirk's actual receipt of NYSE confidences or secrets weighs against disqualifying Frommer.

Likewise, proof that Van Buskirk had access to NYSE confidences or secrets while at Milbank is scant. The NYSE posits that Van Buskirk had access to a centralized electronic document management system and that he could have accessed electronic versions of documents. The record contains uncontroverted evidence that the Milbank document system included a feature that could track each occasion when a person accessed an electronic document and record the person's name and time of access. However, NYSE has furnished no evidence to dem-

onstrate that Van Buskirk ever accessed the electronic files. Thus, NYSE's evidence largely consists of the fact that documents relevant to this case were kept in a cabinet near Van Buskirk's office; but, Van Buskirk states that he never had reason to look at these files. As a young associate at a large New York law firm, it appears unlikely that Van Buskirk would have combed the files of an unassigned case. His statements in this regard are therefore credible. This factor also weighs against imputation.

The above factors are not alone sufficient to rebut the presumption of shared confidences. However, Frommer has also screened Van Buskirk from the case. Thus, the presumption is further rebutted by Frommer's screen.

The screen requires all of Frommer's employees to refrain from discussing the Papyrus litigation with Van Buskirk and from showing him written materials related to it. *See, e.g., Del–Val,* 158 F.R.D. at 273 (discussing similar screen that rebutted the presumption of shared confidences). Moreover, Frommer has ordered Van Buskirk to refrain from communicating with anyone about or reviewing any written materials related to the case. *Id.* Frommer has sealed the firm's document management system so that only members of the team working on the case may access electronic documents. *Id.* Finally, all Frommer employees have agreed in writing to abide by these restrictions. This screen evidences Van Buskirk's and Frommer's understanding of their ethical obligations in this matter. More importantly, it adequately isolates Van Buskirk from the case, thereby immunizing Frommer from his taint.[10]

---

**10.** Indeed, as the NYSE argues, courts have been less reluctant to approve small-firm screens. *See Cheng,* 631 F.2d at 1058 & n. 6 (disapproving of screen erected by satellite office that consisted of approximately twenty attorneys); *Crudele,* 2001 WL 1033539, at *3 (declining to approve screen of fifteen-member law firm). However, there exists no per se rule that a small-firm (to the extent that

The Court next must determine whether the screen was timely erected. In November 2003, Papyrus approached Frommer about representing it in a lawsuit against the NYSE. Frommer conducted an intra-firm conflicts check, and learned that Van Buskirk, although he did no work on the matter and could not recall receiving confidential information about it, was aware that Milbank had represented the NYSE. For this reason, the lead partner on the case and Van Buskirk agreed that he would not work on it.

Approximately three months later, in a March 1, 2004 letter, Milbank raised the conflict issue with Frommer. Milbank alleged that Van Buskirk had received NYSE confidential and privileged information when he received an August 24, 2000 email. A Frommer partner immediately discussed the Milbank letter with Van Buskirk, who stated that he did not recall receiving any such email. On March 4, 2004, Frommer requested details about the email Van Buskirk allegedly received. On March 5, 2004, Milbank responded by furnishing a redacted email message sent by a Milbank partner to the entire intellectual property group, which included Van Buskirk. The very same day Frommer received the redacted email, it instituted a formal screen. Thus, when Frommer received actual notice that NYSE confidences or secrets may have been disclosed to Van Buskirk, it immediately established appropriate screening mechanisms. The Court concludes that Frommer timely screened Van Buskirk.[11]

Given these facts, the Court concludes that there is no real danger that Papyrus may have gained or will gain an unfair advantage over the NYSE if Frommer represents it and that it would be highly unjust to disqualify each member of the Frommer firm. *See id.* at 275. For the foregoing reasons, Frommer has rebutted the presumption of shared confidences or secrets.

## CONCLUSION

Significant competing interests are inherent in a motion to disqualify an attorney. The Court must balance the general policy favoring a party's right to choose its counsel while ensuring that a litigant will not obtain an unfair advantage over an adversary at trial.[12] Having weighed

Frommer, as a fifty-member patent firm qualifies as small) cannot erect an effective screen. The size of a firm may raise doubts as to whether a screen will be effective. *See, e.g., Cheng,* 631 F.2d at 1058; *Mitchell,* 2002 WL 441194, at *10; *Marshall,* 952 F.Supp. at 112. Nonetheless, under the circumstances of this case, the Court concludes that the fifty-member Frommer firm has erected an effective and stringent screen.

11. The Frommer screen was erected immediately after the firm learned that Van Buskirk may have received NYSE confidences or secrets. Before the screen was put in place, Frommer had represented Papyrus for approximately three months. The risk of inadvertent disclosure during this time was minimal: Van Buskirk never brought any files or documents concerning the NYSE–Papyrus matter with him to Frommer and the attorneys who worked on the case never had substantive discussions about the case with him.

*See Del–Val,* 158 F.R.D. at 275 (evaluating similar factors to find that risk of inadvertent disclosure during two-month window before formal screen was erected was minimal). *But see Papanicolaou v. Chase Manhattan Bank, N.A.,* 720 F.Supp. 1080, 1087 (S.D.N.Y. 1989) (concluding that because attorney who violated the no-contact rule "imparted the news he learned to at least four other attorneys," screening was not timely).

12. The interests raised by this motion require the Court to determine whether disqualification is necessary in order to preserve the integrity of this judicial proceeding. *See United States Football League,* 605 F.Supp. at 1463 n. 31. Whether Frommer is acting consistent with the code of ethics by representing Papyrus is a matter that lies within the province of other bodies. *See Etna Prods. Co. v. Tactica Int'l, Inc.,* 234 F.Supp.2d 442, 445 (S.D.N.Y.2002).

these interests, the Court concludes that Van Buskirk must be disqualified; however, the Court harbors no doubt that, in light of the facts presented here, Frommer's screening measures are timely and effective. Van Buskirk may not represent Papyrus, but his disqualification is not imputed to Frommer.

**So Ordered.**